**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SKYWRITER COMMUNICATIONS, INC.,** | |
| **Plaintiff,** | |
| v. | **Civil Action No. 24-368 (JDB)** |
| **UNITED STATES DEPARTMENT OF STATE,** | |
| **Defendant.** | |

**MEMORANDUM OPINION**

Skywriter Communications seeks records from the State Department related to the murder of U.S. Ambassador to Afghanistan Adolph Dubs in 1979. The Department conducted a search and produced relevant records to Skywriter, but withheld certain documents under FOIA Exemptions 1, 6, and 7. Now, both parties have moved for summary judgment. Skywriter contends that the Department's search was inadequate and its invocation of FOIA exemptions improper. The Department argues the opposite. For the reasons discussed below, the Court grants in part and denies in part Skywriter's motion for summary judgment, and grants in part and denies in part the Department's cross-motion for summary judgment.

**BACKGROUND**

Skywriter is a media company that represents investigative journalist Arthur Kent. Compl. [ECF No. 1] ¶ 3. Kent is the author of a book on the 1979 kidnapping and death of U.S. Ambassador to Afghanistan Adolph Dubs. Id. He is writing another book on the same topic and on November 15, 2023, submitted a FOIA request to the State Department seeking documents related to the ambassador's death. Id. ¶¶ 3, 13.

1

The Department failed to respond to the FOIA request, and Skywriter sued to compel production. Id. ¶ 28. Soon after, the Department identified an estimated 1,800 pages of responsive records. Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") [ECF No. 31] at 5. This Court ordered the Department to process those records at a rate of 400 pages a month. Id. The Department completed production of responsive records on May 8, 2025. Id. The Department fully disclosed approximately 1,200 pages, fully withheld 19 pages, partially withheld 56 pages, designated 201 pages as non-responsive, and concluded that 289 pages were duplicative of documents produced by the National Archives and Records Administration or State Department during prior disclosures. Id. The Department withheld documents pursuant to FOIA Exemptions 1, 6, 7(C), 7(D), and 7(E).

On July 31, 2025, the parties moved for summary judgment. See Pl.'s Mot; Def.'s Mot. for Summ. J. ("Def.'s Mot.") [ECF No. 32-2].

## STANDARD OF REVIEW

A party moving for summary judgment must show that "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party filing a cross-motion for summary judgment "concedes that no material facts are at issue only for the purposes of its own motion." McKenzie v. Sawyer, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982).

An agency may prevail at summary judgment by demonstrating that it conducted an adequate search and that any withheld documents fall outside FOIA's disclosure requirements. See Exxon Corp. v. FTC, 663 F.2d 120, 126 (D.C. Cir. 1980). The Court may award summary judgment based on information provided by the agency in affidavits or declarations that, in "reasonably specific detail, demonstrate that the information withheld logically falls within the

claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Mil. Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981). However, if, "even on the agency's version of facts," the material "falls outside the proffered exception," the Court must grant the FOIA plaintiff summary judgment. Petroleum Info. Corp., 976 F.2d 1429, 1433 (D.C. Cir. 1992).

## ANALYSIS

FOIA requires federal agencies to conduct an adequate search for the requested records and then disclose any responsive records unless they fall within one of nine exemptions. 5 U.S.C. § 552. Skywriter contends that the Department's search was inadequate and that its invocation of Exemptions 1, 6, 7(C), 7(D), and 7(E) was improper.

Exemption 1 shields certain records designated by Executive Order as critical to national security. 5 U.S.C. § 552(b)(1)(A). Exemption 6 protects personal, medical, or similar information that could invade the subject's privacy if disclosed. Id. § 552(b)(6). And Exemption 7 guards records compiled for law enforcement purposes, including those where disclosure could invade the subject's privacy, reveal the identity of a confidential source, or disclose techniques and procedures for law enforcement investigations. Id. § 552(b)(7).

### I.    The Department's Search Was Not Adequate

An agency must conduct a search that is "reasonably calculated to uncover all relevant documents." Weisberg v. DOJ, 705 F.2d 1344, 1351 (D.C. Cir. 1983). A search may be reasonable when the agency offers a "plausible justification" for how it scoped the search at issue and then searches those locations. Jefferson v. DOJ, 168 F. App'x 448, 450 (D.C. Cir. 2005); see also Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990). The mere possibility of additional relevant records does not render a search inadequate as long as the agency made a good

faith effort and used methods reasonably calculated to produce the responsive documents.  See Clemente v. FBI, 867 F.3d 111, 117-18 (D.C. Cir. 2017); see also Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 326 (D.C. Cir. 1999) (explaining that courts may rely on an agency's declarations setting forward the method by which the search was conducted).

Sometimes, an agency must go beyond its initial search.  An agency is not required to search every record system available, but it cannot limit its search to a single record system if others are likely to turn up responsive documents.  Oglesby, 920 F.2d at 68.  If an initial search uncovers leads that suggest that searching new locations is "likely to turn up the information requested," the agency must expand its search to those new locations.  Cornucopia Inst. v. Agric. Mktg. Serv., 261 F. Supp. 3d 35, 43 (D.D.C. 2017) (quoting Valencia-Lucena, 180 F.3d at 327).  However, the failure of an agency to locate specific records known to exist does not automatically render the search inadequate.  Sanchez v. DOJ, 297 F. Supp. 3d 188, 190 (D.D.C. 2018).

Skywriter contends that the search process here was deficient because it failed to search outside the Bureau of Diplomatic Security.  Skywriter argues that (1) the Department's initial decision to confine the search to the Bureau of Diplomatic Security was conclusory and insufficient, (2) the Department should have broadened its search once it failed to locate relevant documents known to exist, and (3) the Department overlooked evidence from its initial search that suggested that additional relevant documents had been sent to other bureaus.

None of Skywriter's arguments, alone, would compel the Department to broaden its search.  But together, they are sufficient to require a second look.  Start with the Department's initial decision to limit its search to the Bureau of Diplomatic Security.  The Department submitted two declarations by Timothy Kootz, Deputy Assistant Secretary for Shared Knowledge Services, detailing the Department's search process.  See Decl. of Timothy J. Kootz [ECF No. 32-3]; 2d

Decl. of Timothy J. Kootz [ECF No. 38-2]. Kootz explained that the State Department searched for responsive records at the Bureau of Diplomatic Security because it is "the Department's law enforcement component and because it was involved in the investigation of Ambassador Dubs' death." Def.'s Mot. at 11 (citing Kootz Decl. ¶¶ 5, 19, 20-21). But, as Skywriter argues, that rationale does not justify why the Bureau of Diplomatic Security was the only place the Department searched. Pl.'s Opp'n [ECF No. 37] at 3. Skywriter's point is especially forceful given the historical significance of the Dubs assassination.

Next, consider the fact that the Department's search failed to unearth documents that are known to exist. Skywriter argues that documents produced by the Department reference other relevant documents, but that those referenced documents were not found in the search. Pl.'s Mot. at 8-15. These include dozens of cables, reports, and memoranda relating to the Dubs assassination, including several volumes of a report that had already been partially released. Id. The Department, correctly, counters that the existence of additional responsive documents does not necessarily invalidate an otherwise adequate search. Def.'s Opp'n [ECF No. 38] at 2. But the existence of those documents, in conjunction with other factors, is a "positive indication[] of overlooked materials" that raises doubts about the completeness of the agency's search. See Valencia-Lucena, 180 F.3d at 326 (citation modified).

Finally, Skywriter points out that several of the documents produced by the Department were sent to other Bureaus, which may house additional responsive documents. Specifically, Skywriter notes that responsive documents were sent to the Bureau of Administration, the Bureau of Counterterrorism, the Bureau of Political-Military Affairs, and the Bureau of Consular Affairs. Pl.'s Opp'n at 4-5. The Department counters that the specific documents identified by Skywriter have already been produced in this FOIA request. Def.'s Reply [ECF No. 44] at 1-2. But that

misses the point.  The fact that certain responsive documents were sent to Bureaus outside of the Bureau of Diplomatic Security suggests that other responsive documents may be in those same Bureaus.  See Valencia-Lucena, 180 F.3d at 326 (citation modified).  Indeed, one of the documents Skywriter identified is a fragment of a larger still-unproduced report on the assassination.  Pl.'s Opp'n at 4-5.  And the Department does not attempt to refute Skywriter's reasonable inference that those other bureaus may possess relevant, unproduced documents.  In sum, Skywriter's first two arguments suggest that additional responsive documents exist, while its third argument points towards where those documents may be located.  Together, Skywriter's arguments are enough to suggest that searches beyond the Bureau of Diplomatic Security are "likely to turn up the information requested."  Cornucopia Inst., 261 F. Supp. 3d at 43 (citation modified).

Skywriter also argues that the Department construed its request too narrowly by failing to produce certain records deemed nonresponsive.  Pl.'s Mot. at 15-17.  Skywriter insists that any information relevant enough to be placed in the same hard-copy box as a disclosed record is "presumptively" responsive to its request, as it is likely connected to the kidnapping and murder of Ambassador Dubs.  Id. at 17.

Here, Skywriter is mistaken.  There is no rule that any document located in the same box as a responsive document must be disclosed.  According to Kootz, the records deemed non-responsive dealt with matters outside the scope of Skywriter's request.  For example, some of the records were diplomatic cables that did not "relate to or contain any information about the Dubs assassination."  Kootz Decl. ¶ 29.  That representation is entitled to a "presumption of good faith."  SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  Skywriter's speculation that the records might be responsive is insufficient to overcome the Department's clear and specific attestations to the contrary.

Accordingly, the Department's search was inadequate insofar as it ignored evidence that responsive documents may be located in the Bureaus of Administration, Counterterrorism, Political-Military Affairs, and Consular Affairs. The Court grants summary judgment to Skywriter on this point.

## II.    The Department's Withholdings Were Proper

Skywriter next argues that the Department improperly invoked several FOIA exemptions to justify withholding records. The Department raised Exemptions 1, 6, 7(C), 7(D), and 7(E). In each case, the withholdings were justified.

### A.  Exemption 1

FOIA Exemption 1 protects records that are specifically designated "by an Executive order to be kept secret in the interest of national defense or foreign policy" and "are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). To invoke Exemption 1, the government must "describe with reasonable specificity the material withheld and identify the damage to the national security expected to attend its disclosure" and the "consequences of disclosing the sought-after information." King v. DOJ, 830 F.2d 210, 221, 223-24 (D.C. Cir. 1987). Although an agency may not rely on mere conclusory assertions about national security consequences and must provide a document-specific explanation of its reasoning, id., the D.C. Circuit has emphasized that courts should "defer[] to executive affidavits predicting harm to the national security," and explained that it is "unwise to undertake searching judicial review." Ctr. for Nat. Sec. Stud. v. DOJ, 331 F.3d 918, 927 (D.C. Cir. 2003).

The Department asserts Exemption 1 for records classified under Executive Order 13526, which permits classification of "intelligence activities (including covert action), intelligence sources or methods, or cryptology." Exec. Order 13526 § 1.4(c) (Dec. 29, 2009). Skywriter argues

7

that the Department's alleged national security harms are conclusory and insufficient.  Pl.'s Mot

at 19.  It relies on <u>King v. DOJ</u>, where the D.C. Circuit rejected the government's attempt to justify

its invocation of Exemption 1 through an inscrutable Vaughn Index and declaration consisting

wholly of category-level justifications and lists of serial alternatives.  830 F.2d at 221-24.  The

<u>King</u> court found troubling the government's lack of particularized justification for withholding

because the age of the documents, all at least 35 years old, suggested that disclosure would not

imperil national security.  <u>Id.</u> at 226.  According to Skywriter, the Department's justifications for

withholding the records at issue here are similarly threadbare, and so should be rejected.[1]

Skywriter is wrong.  The Department's Declaration and Vaughn Index are far more detailed

than in <u>King</u>; they provide specific descriptions of redacted material and explain the national

security harms from disclosure.  For example, the Kootz declaration describes one record that

contains a timeline of the abduction and assassination of Ambassador Dubs and includes

"intelligence communications and reveals information from specific intelligence sources regarding

the day's events."  Kootz Decl. ¶ 38.  The disclosure of these materials could jeopardize national

security interests by revealing intelligence sources and methods, which would allow adversaries

to "take countermeasures to nullify [their] effectiveness."  <u>Id.</u> ¶ 39.  Similarly, the Vaughn Index

describes the withheld records in reasonable detail, allowing the Court to infer that the disclosure

of withheld records would reveal intelligence information.  <u>E.g.</u>, Second Amended Draft Vaughn

Index ("Vaughn Index") [ECF No. 42] at 2 (describing cables between the U.S. embassy in Kabul

and Department headquarters).  And although the Court in <u>King</u> was skeptical of the harm from

disclosing decades-old, classified materials, in this case the Department has specifically explained

that the disclosure of these records could allow adversaries to "identify U.S. intelligence sources

---

[1] Skywriter does not dispute that the other requirements of Executive Order 13526 are met.

and activities and to undertake countermeasures . . . [and] reprisals that would damage the potential for similar intelligence sources to cooperate with [future] investigations."  Kootz Decl. ¶ 40.  The Department has reasonably explained that revealing these intelligence gathering techniques would harm national security even decades later.

Lastly, Skywriter contends that the Department improperly applied Exemption 1 to withhold parts of unclassified records.  Pl.'s Reply at 7-8.  The Department counters that those declassification markers were erroneous and that it re-released the records with corrected classification markers.  2d Kootz Decl. ¶¶ 3-4.  In its reply, Skywriter pointed to an unclassified document that still appeared to be listed as redacted in the Department's Vaughn Index.  Pl.'s Reply at 8.  Based on this record, it is unclear whether the Department has improperly withheld unclassified documents under Exemption 1, the example Skywriter points to is another clerical error, or another exemption provides a basis for the redaction at issue.

In sum, the Department properly withheld records under Exemption 1 except to the extent that it withheld unclassified materials on that basis.  The Court will order the Department to submit a supplemental notice on this issue.  In all other respects, the Court grants the Department summary judgment as to Exemption 1.

## B.  Exemptions 6 and 7(C)

Exemption 6 shields "personnel and medical and similar files" if their disclosure "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  To withhold under Exemption 6, an agency must first demonstrate that the withheld information qualifies as a "personnel," "medical," or "similar" file, and then demonstrate that the privacy interest protected

by concealing the data outweighs the public interest in its release.  See U.S. Dep't of State v. Wash. Post Co., 456 U.S. 595, 599-603 (1982).[2]

The release of names and personal information in government files "depends on the individual characteristics that disclosure reveals and the consequences that are likely to ensue." Hertzberg v. Veneman, 273 F. Supp. 2d 67, 86 (D.D.C. 2003) (quotation omitted).  The threat to personal privacy must be "clearly unwarranted" in light of the public interest in disclosure.  See Mobley v. CIA, 924 F. Supp. 2d 24, 69 (D.D.C. 2013) (holding records properly fell within Exemption 6 when plaintiff did not argue there was a public interest in releasing names of federal employees involved in investigation).  Unless the FOIA request "advances the citizens' right to be informed about what their government is up to, no relevant public interest is at issue."  Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 34 (D.C. Cir. 2002) (citation modified).

Exemption 7(C) overlaps in part with Exemption 6.  It covers records "compiled for law enforcement purposes" when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  The agency must first show that the records were created for "law enforcement" purposes.  To qualify, the agency "need only establish that there is a colorable claim of rationality to the alleged connection between the collection of the information and law enforcement."  Goldstein v. Off. of Indep. Couns., Civ. A. No. 87-2028, 1999 WL 570862, at *9 (D.D.C. July 29, 1999).  The agency must then demonstrate that disclosure would create an "unwarranted" intrusion into personal privacy.  The second step provides "somewhat broader" grounds for withholding than Exemption 6, which requires a "clearly unwarranted" invasion of privacy.  Roth v. DOJ, 642 F.3d 1161, 1173 (D.C. Cir. 2011) (quotation omitted).  Exemption 7(C) also protects the privacy interests of family members, who

---

[2] There is no disagreement that the withheld records are the type of files covered by Exemption 6; Skywriter only argues that the interest in public disclosure outweighs the interest in privacy.

may suffer unwanted attention and harassment from the disclosure of their information.  See Nat'l Archives & Recs. Admin. v. Favish, 541 U.S. 157, 165 (2004); Mobley, 924 F. Supp. 2d at 71 (holding that identity of deceased officer was properly withheld to protect privacy interests of surviving close relatives).

Skywriter first argues that the records at issue were not created for "law enforcement purposes" and thus the Department cannot invoke Exemption 7(C).  That is incorrect.  These records were created as part of an investigation into the assassination of a sitting U.S. ambassador. The investigation was led by the Bureau of Diplomatic Security, the State Department's law enforcement arm, which is authorized to conduct investigations, execute warrants, and make arrests.  See 22 U.S.C. § 2709(a); Guidelines for the Exercise of the Law Enforcement Authorities by Special Agents of the Diplomatic Security Service, 70 Fed. Reg. 17498 (2005); see also Jud. Watch, Inc. v. U.S. Dep't of State, 282 F. Supp. 3d 36, 42-44 (D.D.C. 2017) (deeming records created by the Bureau of Diplomatic Security to be created for law enforcement purposes).  In its Vaughn Index, the Department specifically explains the connection between each withheld record and the investigation.  E.g., Vaughn Index at 3 ("The Department also withheld the names and other identifying information of a foreign service national who provided a statement to law enforcement as part of the investigation and foreign individuals who assisted U.S. law enforcement and the Embassy with the investigation . . . .").  That is enough to constitute law enforcement purposes.

Skywriter next contends that the Department's justifications for protecting privacy are insufficient.  It argues that "the Department has provided no information regarding who [the third parties] are, what their privacy interests may be, or whether they remain alive."  Pl.'s Mot. at 29. Skywriter also argues that the age of the documents, 45 years, militates in favor of disclosure.  Id.

Here too, Skywriter is mistaken. "[T]he public interest in learning the names of these lower-echelon employees is small." Elec. Priv. Info. Ctr. v. DHS, 384 F. Supp. 2d 100, 117 (D.D.C. 2005). It is well recognized that "[n]ames alone will not shed light on how the agenc[y] work[s]." Id. at 116. Inversely, the public interest is stronger when the plaintiff proffers specific reasons that the withheld identities themselves are at issue, such as by alleging that those employees were engaged in negligence or malfeasance. See Favish, 541 U.S. at 165. But Skywriter does not explain how the withheld names and titles will help the public understand the Dubs assassination beyond the voluminous material the Department has already disclosed. See Vaughn Index at 2 ("[T]here is limited public interest in knowing the exact identity of the working-level employees involved in a communication."). Indeed, in its brief, Skywriter proffers no specific public interest in learning these names apart from generally "shed[ding] light on the government's international operations and the history of U.S. diplomacy and foreign affairs." Pl.'s Mot. at 29.

The Department, on the other hand, has persuasively argued that disclosure would harm the individuals in question. In general, Government employees "have a privacy interest in their identifying information and information about their personal lives so that it is not available to individuals who might be dissatisfied with the employees' work and thus could seek to contact and/or criticize them." Nova Oculus Partners, LLC v. SEC, 486 F. Supp. 3d 280, 290 (D.D.C. 2020) (quotation omitted); see also Ecological Rts. Found. v. EPA, 541 F. Supp. 3d 34, 65 (D.D.C. 2021) ("[A]n agency need not establish much more than the fact of disclosure to establish foreseeable harm."). Here, the Department has withheld the names and identifying information of only twenty individuals. The discerning nature of its redactions suggests the Department carefully considered whether the circumstances of each person required withholding. In each case, the

Department concluded that disclosure could cause "unwarranted, hostile attention," and potentially "violence or serious harm."  2d Kootz Decl. ¶ 9.  It is easy to foresee how broadcasting the identities of individuals involved in a high-profile murder investigation could lead to harassment. Cf. Elec. Priv. Info. Ctr., 384 F. Supp. 2d at 116-17 (concluding that employees involved in controversial security programs faced increased exposure to harassment).  This is especially true for those who live in Afghanistan, where evidence of past cooperation with the U.S. government could imperil the cooperator.  Kootz Decl. ¶ 48.  And although these records were created decades ago, the Department has credibly represented that nearly all the withheld individuals are still alive and, for the remaining names, that their surviving family would be harmed by the disclosure of their personal records.  2d Kootz Decl. ¶¶ 7-10.

Accordingly, disclosure of the identifying information at issue is clearly unwarranted.  The Department is entitled to summary judgment on Exemptions 6 and 7(C).

### A. Exemption 7(D)

Exemption 7(D) protects records compiled for law enforcement purposes when those records "could reasonably be expected to disclose the identity of a confidential source."  5 U.S.C. § 522(b)(7)(D).  Unlike other FOIA exemptions, withholdings under Exemption 7(D) need not be justified by a balancing of public and private interests—if the production of a record would disclose a confidential source, "that ends the matter."  Gilliam v. DOJ, 236 F. Supp. 3d 259, 266 (D.D.C. 2017) (quotation omitted).  Courts interpret Exemption 7(D) to provide the "most comprehensive protection of all of FOIA's law enforcement exemptions."  Billington v. DOJ, 301 F. Supp. 2d 15, 22 (D.D.C. 2004) (citation omitted).

Skywriter first contends that the Department cannot invoke Exemption 7(D) because its proffered justifications are "boilerplate."  Pl.'s Mot. at 24.  That argument is meritless.  The

Department provides ample detail and context to explain its Exemption 7(D) withholdings. For example, one cable was withheld because it contained information that would identify a confidential source who provided information about the assassination. Kootz Decl. ¶ 59. The Department also explained that "all the information withheld under Exemption 7(D) emanated from informants explicitly promised confidentiality, or else from sources where it is reasonable to assume" that they "were promised that their identities would remain confidential." Def.'s Mot. at 16-17; see also Kootz Decl. ¶ 58; cf. Miller v. DOJ, 562 F. Supp. 2d 82, 123 (D.D.C. 2008) (finding, where information concerned drug trafficking, it was reasonable to infer confidentiality). The Vaughn Index similarly explains the context for each Exemption 7(D) withholding and includes particular details about the context in which each record was created. Given the sensitive nature of the Dubs investigation, and potential retribution against those who cooperate with the U.S. government in such a context, it is also reasonable to infer confidentiality from the circumstances of the investigation. The Department's burden to invoke Exemption 7(D) is thus satisfied.

Skywriter pivots in its opposition brief to arguing that the Department should redact the names of the confidential sources and release the remainder of the records. But Exemption 7(D) does not merely protect names, it protects any information, including contextual details, "to the extent" that disclosure would unmask the source. 5 U.S.C. § 552(b)(7)(D). Here, the Department has withheld information under Exemption 7(D) in only five documents and provided detailed justifications for each withholding. See Kootz Decl. ¶ 59. The Department has attested that it conducted a line-by-line analysis of the redacted documents and concluded that no additional information could be disclosed, id. ¶ 65, and that attestation is entitled to a presumption of good faith, see Wash. Post Co. v. Special Inspector Gen. for Afg. Reconstruction, Civ. A. No. 18-2622,

2021 WL 4502106, at *23 (D.D.C. Sept. 30, 2021) ("Where an agency has conducted a line-by-line review and provided an affidavit in support, it is entitled to the presumption that it has produced the segregable portions.").  Accordingly, the Department's invocation of Exemption 7(D) is proper.  The Court will grant the Department summary judgment on this issue.

### B.  Exemption 7(E)

Exemption 7(E) shields law enforcement records about investigation or prosecution "techniques and procedures" or "guidelines" when disclosure could "reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  To justify withholdings, the agency must only "demonstrate logically how the release of the requested information might create a risk of circumvention."  Blackwell v. FBI, 646 F.3d 37, 42 (D.C. Cir. 2011) (quotation omitted).  This is "a relatively low bar."  Id.

Skywriter argues that the disclosure of decades-old records cannot risk circumvention of the law because the law enforcement techniques discussed are "outdated and of no current significance."  Pl.'s Mot. at 26.  It also contends that the Department's descriptions of the withheld records are too vague.  Id.  Both arguments are wrong.

The Department attests that "the investigative methods specified" in the records "remain in use."  2d Kootz Decl. ¶ 20.  For example, several of the documents deal with "surveillance and security protocols" which, despite their age, are "still used . . . to protect embassy staff abroad." Id.  Skywriter, by contrast, provides no evidence that the types of law enforcement techniques in use during the Dubs investigation are now obsolete.  And far from deploying generalities, the Department amply describes each withheld record in the Vaughn Index, allowing the Court to conclude that disclosure of those methods could reasonably allow circumvention of law enforcement operations.  See Vaughn Index at 3, 5-6, 16 (explaining that the records relate to

undercover evidence-gathering operations and strategies for collaboration with foreign law enforcement officials).  That is enough.  The Department's invocation of Exemption 7(E) is thus proper and the Department is entitled to summary judgment.

## CONCLUSION

This Court grants in part and denies in part Skywriter's motion for summary judgment, and grants in part and denies in part the Department's cross-motion for summary judgment.  The Department's search was inadequate insofar as it failed to conduct follow-up searches in the Bureau of Administration, the Bureau of Counterterrorism, the Bureau of Political-Military Affairs, and the Bureau of Consular Affairs.  The Department's invocation of various FOIA exemptions, however, was proper, except to the extent that the Department has withheld unclassified information under Exemption 1.

A separate order shall issue on this date.

_____ /s/ _____

JOHN D. BATES
United States District Judge

Dated: December 31, 2025